**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**TROY G. AVERA,**

     **Plaintiff,**

**vs.**                                **Case No. 4:08cv550-RH/WCS**

**UNITED AIR LINES,**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

The remaining Defendant, United Air Lines, has moved for summary judgment. Doc. 86.  Plaintiff has responded.  Docs. 88 (affidavit) and 89 (memorandum).

Plaintiff has also filed a statement of disputed and undisputed facts.  Doc. 91. Defendant was permitted to file a reply.  Doc. 92, exhibit A (doc. 92-2 on ECF), refiled as doc. 103.  It should be noted that the reply memorandum itself had an exhibit 1, excerpts from the deposition of Plaintiff, which should have been refiled as an exhibit to doc. 103, but was not.  There is no need to correct the docket, however, as the deposition excerpts attached to exhibit A to doc. 92 has been reviewed in conjunction with this motion for summary judgment.

**Status of the parties**

As another housekeeping matter, United Air Lines should be the only remaining Defendant. Claims against the United States Department of Transportation and the Federal Aviation Administration were dismissed. Doc. 66. The United States of America was separately named as a Defendant, doc. 43, and was included in the motion to dismiss filed by the "federal defendants." Doc. 52. I recommended that monetary claims against the United States (and the other federal defendants) be dismissed due to sovereign immunity, doc. 62, pp. 8-10, and that equitable claims challenging the Age 60 Rule were moot, doc. 62, pp. 10-11. I also recommended that the court sustain the FTEPA (the Fair Treatment of Experienced Act) against all constitutional challenges. Doc. 62, pp. 11-22. The presiding district judge agreed. Doc. 66, p. 2. That order expressly dismissed claims against the United States Department of Transportation and the Federal Aviation Administration, and undoubtedly intended to dismiss claims against the United States of America.

**Claims in the Amended Complaint, doc. 43**

Plaintiff has 45 years experience as a pilot. He has many years of experience as a commercial airline pilot. During his career, the FAA had a Rule that pilots may no longer fly upon reaching age 60. Plaintiff's 60th birthday occurred in May, 2007, and he lost his job with United Airlines. In December, 2007, Congress enacted the Fair Treatment of Experienced Pilot Act ("FTEPA") extending the retirement age to 65. It made the law partially retroactive to Plaintiff and others who had been forced to retire at

age 60 but who were still not yet age 65,[1] but did not restore their seniority. Plaintiff reapplied for a piloting job, but was not hired.

Plaintiff alleges that United Air Lines violated the Age Discrimination in Employment Act (ADEA): (1) in December, 2006, by failing in joining with Plaintiff in a petition to the FAA request for an exemption (waiver) from the Age 60 Rule (doc. 43, p. 4, ¶ 18); (2) on May 12, 2007, by removing Plaintiff from flying status when Plaintiff reached age 60, and then terminating Plaintiff on May 31, 2007, solely due to his age (doc. 43, p. 5, ¶ 19); (3) by denying Plaintiff's request for a leave of absence so that Plaintiff could remain in employment status awaiting the change to the Age 60 Rule that was eventually enacted by the FTEPA (doc. 43, p. 5, ¶ 20); (4) by failing to offer Plaintiff other employment opportunities, specifically a job as a flight simulator instructor or other jobs over flight operations, while offering such jobs to applicants under age 40 (doc. 43, p. 5, ¶ 21); and (5) by refusing to hire Plaintiff in December, 2007, after the FTEPA was enacted, while Defendant employed applicants younger than age 40 in 2007 (doc. 43, p. 5, ¶ 24).

Plaintiff also alleges that United Air Lines violated the Employee Retirement Income Security Act (ERISA) by negotiating a retirement plan which discriminated against Plaintiff solely due to his age (doc. 43, p. 7, ¶¶ 29 and 30).

**Standard of Review**

"[A] motion for summary judgment requires the moving party to show the absence of any genuine issues of fact. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*,

---

[1] The group are those who were born between December 13, 1942, and December 13, 1947.

477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the moving party

meets its initial burden on summary judgment, the non-moving party must submit facts

showing a genuine issue of material fact. Fed. R. Civ. Pro. 56(e).  As summary

judgment allows a court 'to isolate and dispose of factually unsupported claims or

defenses,' *Celotex*, 477 U.S. at 323-24, 106 S.Ct. 2548, the court resolves any dispute

in the evidence 'in the light most favorable to the opposing party.'  *Adickes v. S.H. Kress*

*& Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)." Imaging Business

Machines, LLC. v. BancTec, Inc., 459 F.3d 1186, 1192 (11th Cir. 2006).

**Undisputed facts**

### The history of the Age 60 Rule[2]

The FAA has authority to issue "regulations in the interest of safety for the

maximum hours or periods of service of airmen and other employees of air carriers" and

establish "minimum safety standards."  49 U.S.C. § 44701(a)(4), (b)(1), (d)(1)(A).  Doc.

52, p. 5.  Exemptions to FAA regulations are permitted only if "in the public interest."  49

U.S.C. § 44701(f).  *Id.*  The most important public interest is for the "safety and security"

of air commerce.  49 U.S.C. § 40101(d)(1).  *Id.*

The FAA issued a rule in 1959 providing that no person could serve as "a pilot on

an airplane . . . if that person has reached his 60th birthday."  14 C.F.R. § 121.383(c).

Supporting that decision was the FAA's finding "that there is a progressive deterioration

of certain important [physiological] and psychological functions with age, that significant

medical defects attributable to this degenerative process occur at an increasing rate as

age increases, and that sudden incapacity due to such medical defects becomes

---

[2] Some of this is repeated in Defendant's statement of undisputed facts.

significantly more frequent in any group reaching age 60." 24 Fed. Reg. 9767, 9767

(1959), *quoted in* doc. 52, pp. 5-6. Due to safety risks and the unpredictable nature of

such an incapacity, the "Age 60 Rule" was created to prohibit persons from piloting

large commercial aircraft after reaching age 60. Doc. 52, p. 6.

On December 13, 2007, nearly fifty years after the Age 60 Rule, the FTEPA was

passed allowing "a pilot [to] serve in multicrew covered operations until attaining 65

years of age." 49 U.S.C. § 44729(a); doc. 52, p. 6. The law expressly abrogated the

"Age 60 Rule." 49 U.S.C. § 44729(d); doc. 52, p. 6.

The statute is not retroactive to any pilot who had already attained age 60, with

two exceptions.[3] The "non-retroactivity" clause of FTEPA means "that individuals who

were over 60 when FTEPA was passed can work as pilots, but – unless they are

'required flight deck members' – *without their accrued seniority*." Brooks v. Air Line

Pilots Ass'n, Intern., 630 F.Supp.2d 52, 53 (D. D.C., 2009) (emphasis added). "The

cancellation of seniority is significant, because pilots are allocated work through a

competitive bidding system that gives senior pilots priority in choosing the types of

---

[3] The statute provides:

**(1) Nonretroactivity**. – No person who has attained 60 years of age
before the date of enactment of this section may serve as a pilot for an air
carrier engaged in covered operations unless –

**(A)** such person is in the employment of that air carrier in such operations
on such date of enactment as a required flight deck crew member; or

**(B)** such person is newly hired by an air carrier as a pilot on or after such
date of enactment without credit for prior seniority or prior longevity for
benefits or other terms related to length of service prior to the date of
rehire under any labor agreement or employment policies of the air carrier.

49 U.S.C.A. § 44729(e)(1).

aircraft they will fly, their positions in the cockpit, the locations they fly from, and the trips they will work."[4]  *Id.*

Finally, the FTEPA also creates an exemption for liability for actions taken pursuant to either the FTEPA or the Age 60 Rule.  Doc. 52, p. 7; 49 U.S.C. § 44729(e)(2).  That section provides:

> An action taken in conformance with this section, taken in conformance with a regulation issued to carry out this section, or taken prior to the date of enactment of this section in conformance with section 121.383(c) of title 14, Code of Federal Regulations (as in effect before such date of enactment), may not serve as a basis for liability or relief in a proceeding, brought under any employment law or regulation, before any court or agency of the United States or of any State or locality.

49 U.S.C. § 44729(e)(2).

**Undisputed facts from Defendant's statement of undisputed facts[5]**

1.  Defendant United Air Lines is a commercial airline carrier, with headquarters in Chicago, Illinois.

2.  As a "common carrier by air engaged in interstate or foreign commerce," United Air Lines is subject to the provisions of the Railway Labor Act (RLA), 45 U.S.C. § 181, which governs labor relations in the airline industry.

---

[4] Thus, since Plaintiff was not employed when the FTEPA took effect, his seniority was cancelled and when he had the opportunity to apply again (to fly during the period he was ages 60 through 65), he no longer had seniority.

[5] Defendant presented a comprehensive statement of undisputed facts, doc. 86-1, and Plaintiff, for the most part, has not come forward with evidence to create genuine disputes of material fact as to these assertions.  Therefore, I have copied the statement almost verbatim and have used the paragraph numbers used by Defendant.  I have omitted many of the citations to the record, and have omitted unnecessary portions, but have cited the record for the more important factual issues.  There are several instances where Defendant's statement is incomplete, and I have added material evidence provided by Plaintiff, with a record citation, where needed.

3.  Plaintiff Troy G. Avera was employed by United as a pilot, beginning on May 8, 1995.

4.  During the time relevant to this lawsuit, United employed Avera as a co-pilot on an augmented flight crew for a 747 aircraft.

5.  Avera was born on May 12, 1947[,] and turned sixty years old on May 12, 2007.

6.  At all relevant times, the Air Line Pilots Association (ALPA) has been the collective bargaining representative under the RLA for pilots employed by United.[6]

7.  In 2003, ALPA and United entered into a collective bargaining agreement (CBA), which governs, among other things, pilot seniority, leaves of absence, and benefits.

8.  Avera was represented by ALPA during his entire employment with United.

9.  As required by the RLA, the 2003 collective bargaining agreement between United and ALPA sets forth grievance and arbitration procedures for resolving disputes involving the interpretation or application of the agreement.

10.  Avera knew that under applicable Federal Aviation Administration (FAA) regulations (the Age 60 Rule) he could not legally fly as a pilot or co-pilot for United after turning sixty years old.

11.  During Avera's employment with United, the airline had no reason to anticipate that the Age 60 Rule would change.

---

[6] Plaintiff brought related claims against ALPA in a separate suit, case number 4:09cv218.  That case ended unfavorably to Plaintiff.  See docs. 43 (report and recommendation) and 44 (order adopting) in that case.

12. On or about January 1, 2005, United and ALPA entered into a letter of agreement under the CBA entitled "Bankruptcy Exit Agreement."

13. As part of the Bankruptcy Exit Agreement, United agreed that, as a necessary part of its pending Chapter 11 bankruptcy proceedings, it would issue $550 million of convertible notes for ALPA to distribute to affected pilots. Avera refers to the convertible notes as "retirement funds" and "bond notes," using the various terms interchangeably.[7]

14. The notes were meant to assist pilots in recovering some of the value of the benefits lost as a result of United's bankruptcy.

15. Under the Bankruptcy Exit Agreement, "[d]istribution mechanics, eligibility, and allocation [of the notes] among such pilots [was] to be reasonably determined by" ALPA.

16. In accordance with the Bankruptcy Exit Agreement, ALPA created the formula used to determine how much each individual pilot received as part of the convertible note sale. Doc. 86-7, deposition of Michael Gillen, p. 124 (7 on ECF).

17. Avera does not know who distributed the notes, who paid out the proceeds, or who sold the notes.

18. At no point did Avera complain to anybody at United about the changes to any post-retirement benefits.

19. In 1997, when Avera was approximately fifty years old, United granted him a

---

[7] Plaintiff did not allege any claims in his amended complaint, doc. 43, concerning the issuance of these convertible notes, and therefore such claims are not properly before the court. However, I have provided the undisputed facts concerning these events as presented by both parties in the interest of completeness.

ninety-day personal leave of absence to assist the law firm of Barwick, Dillian, Lambert & Ice in defending American Airlines in a lawsuit.

20.   Avera is an active member of the Florida Bar in good standing and is admitted to practice in the United States District Courts for the Middle and Southern Districts of Florida.

21.   In addition, between 1998 and 2004, United permitted Avera to take two medical leaves of absence.

22.   Two months before his sixtieth birthday, on or about March 9, 2007, Avera sent United's Chairman of the Board, Glenn Tilton, a letter asking that United assist Avera in requesting a waiver of the Age 60 Rule from the FAA.

23.   Based on a speech by Marion Blakely and a related circular, Avera believed that United joining him in his request to the FAA would somehow cause the FAA to grant his request.

24.   Avera did not ask any other management-level employee about his FAA waiver request.

25.   On or about April 4, 2007, United's Managing Director of Labor Strategy-Flight, Jay Milone, wrote to Avera explaining that United would not join Avera's request to the FAA because the FAA had stated that it would not rule on any waiver requests at that time.  The letter from Milone to Plaintiff dated April 4, 2007, explains that the FAA did not intend to rule on waiver requests while changes to the Age 60 Rule were pending.  Doc. 86-6, Milone Ex. 72 (p. 16 on ECF).

26.   After receiving Milone's letter, Avera did not discuss his request with anyone else at United.

27.  Avera also requested an eighteen-month leave of absence beginning on May 11, 2007, the day before his sixtieth birthday.  This request was in a letter to a Captain Krakowski.  Doc. 86-3, deposition, pp. 90-92 (pp. 36-38 on ECF).

28.  Avera sought the leave of absence to "bridge the gap" between the date he would turn sixty years old and the date that he hoped the Age 60 Rule would be overturned.

29.  United denied Avera's request for a leave of absence.

30.  United's past practice, under the terms of the CBA (collective bargaining agreement) with ALPA, was to terminate any leave of absence when a pilot reached age sixty.  Doc. 86-6, deposition of Jay Milone, pp. 27-28 (pp. 9-10 on ECF).

31.  Leaves of absence terminated at that point because the pilot was no longer eligible to fly an aircraft in a Part 121 operation.  Doc. 86-6, deposition of Milone, p. 31 (p. 12 on ECF).

32.  Because pilot leaves of absence were governed by the CBA, United could not grant any request for a leave that extended beyond a pilot's sixtieth birthday, such as the leave Avera requested, without entering into a letter of agreement with ALPA. United Air Lines needed the consent of ALPA to amend the contract to allow a pilot to be on a leave of absence beyond age 60.  Doc. 86-6, deposition of Milone, pp. 28-29 (pp. 10-11 on ECF).

33.  ALPA had indicated that it could not take a position on the Age 60 Rule until ALPA International provided it with direction on how to handle the issue.

34.  Accordingly, ALPA and United had not discussed or negotiated an agreement that would permit United to grant Avera's request for a leave of absence.

35. On May 12, 2007, Avera turned sixty years old.

36. On the same day, and in accordance with the Age 60 Rule, United removed Avera from his flight status as a pilot.

37. Avera understood that the Age 60 Rule was still in effect on the date that he turned sixty years old.

38. Avera further understood that United removed him from active flight status solely based on the Age 60 Rule.

39. Although they were available to him, Avera did not elect to enroll in United's medical insurance or dental benefits plans after he retired. He testified that he did not enroll in the medical plan because it cost $1200 per month, his retirement benefits were only $1400 per month, and he could not afford it. Doc. 86-4, deposition, p. 154 (p. 16 on ECF); doc. 86-5, p. 213 (p. 3 on ECF).

40. During the months before he turned sixty years old, Avera did not apply for any other position at United, including the pilot instructor (simulator) position. Avera is unaware of any specific individual who was offered a position that he believes United should have offered to him. Plaintiff testified that when he inquired about the flight simulator instructor position, he was told that he "had to be on the seniority list, and to be on the seniority list, I had to be 60, and there was no need to bother applying because I would not be accepted." Doc. 86-3, deposition, p. 39 (p. 8 on ECF). He said that "both United and ALPA to my knowledge had decided that you had to be on the seniority list and you had to be age 60 to be on the seniority list." *Id.*, p. 40. It is assumed that Plaintiff meant that one had to be less than 60 years of age to be on a seniority list.

41.  Avera also never inquired about how to apply for a pilot instructor position. He testified that he did not ask about the application process because it would be futile. Doc. 86-3, deposition, p. 89 (p. 35 on ECF).

42.  On December 13, 2007, Congress passed the FTEPA, codified at 49 U.S.C. § 44729.

43.  The FTEPA replaced the FAA's Age 60 Rule, which had remained in full effect until December 13, 2007.

44.  The FTEPA raised the mandatory pilot retirement age to sixty-five.

45.  Under the FTEPA, pilots under age sixty-five who had turned sixty while the Age 60 Rule was in effect were eligible to apply for pilot positions as newly hired employees on or after December 13, 2007; however, those retired pilots would not maintain any prior seniority or longevity.  49 U.S.C. § 44729(e)(1).

46.  After the FTEPA was enacted on December 13, 2007, United considered job applications from pilots between the ages of sixty and sixty-five.

47.  In approximately January 2008, United hired an individual who was over the age of sixty for a new hire pilot position.

48.  Additionally, as of December 13, 2007, United still employed 233 individuals as Captains or First Officers who were only seven months to two years younger than Avera, including one pilot who was born on December 13, 1947 and turned 60 on December 13, 2007, the effective date of the FTEPA.  Doc. 86-9, declaration of Jay Milone, p. 2 (p. 3 on ECF).

49.  On December 17 or 18, 2007, after the  FTEPA was enacted, Avera submitted an online application with United for a new-hire pilot position.

50. In completing his online application, Avera answered in the negative a screening question about his ability to fly into all countries United serves.

51. The ability to fly unrestricted into all countries that United serves is a prerequisite for all pilot applicants; thus, Avera's answer to this question automatically disqualified him from consideration for the position.

52. Based upon his answer to that question, Avera received an instant electronic message that his "answers do not satisfy the minimum requirements" for the new hire pilot position.

53. Avera did not contact anyone at United to discuss why his answers did not meet the minimum qualifications for the position.

54. Sometime in late January, after learning of Avera's attempt to apply online, someone at United contacted Avera to discuss why his answers disqualified him from the new hire pilot position.

55. As a result of this conversation with the United employee, Avera completed the on-line application a second time, correcting his previous incorrect answer regarding his ability to fly without restriction into all countries that United serves, and this time he did not receive the message that his answers did not meet the minimum qualifications for the position.

56. Shortly after Avera completed the second application, on or about February 1, 2008, he received an e-mail from United's Human Resources Department that, based on his qualifications, United would like to speak with him about a pilot position.

57. The e-mail further requested Avera to call a specific number to schedule a phone verification appointment.

58. On that same date, Avera uploaded his resume onto United's website.

59. During the hiring process, Avera was placed in a queue with other pilots moving through the same process.

60. As a retired pilot, Avera was excused from the personality assessment or the logbook screening portions of the screening process; however, he did not advance at a faster rate because of this.

61. Rather, he retained his place within the queue based on his date of application.

62. On or about March 6, 2008, Avera attended an in-person panel interview with two United employees in Chicago.

63. On or about March 21, 2008, United's Board of Review reviewed Avera's hiring documents and interview results and approved his application for a new-hire pilot position.

64. Other than the new-hire pilot position, Avera did not apply for any other positions at United after he turned sixty years old.

65. In mid-March 2008, United instituted a hiring freeze for all pilots due to declining economic conditions and downsizing of the company.

66. On or about April 22, 2008, Avera was notified by United that, although he had successfully completed the application process, United could not offer him a start date due to economic conditions. Doc. 86-7, deposition of Gillen, p. 185 (p. 11 on ECF).

67. Between March 2008 and the present, United did not hire any new pilots.

68.  Avera is unaware of any individual who has been hired as a pilot for United since April 2008.

69.  Avera admits that he cannot identify any specific individual at United who he believes discriminated against him based on his age.

**Undisputed facts from Plaintiff's affidavit, doc. 88**[8]

7.  Plaintiff was employed by United Air Lines from May 8, 1994, to May 31, 2007.

12.  Pursuant to a letter of agreement in the collective bargaining agreement with ALPA, Plaintiff was allocated 1558-1482 shares of United Air Line common stock, apparently as a part of United's bankruptcy.  However, United distributed only 768 shares to Plaintiff, and the reduction in number was "by a GAP2 formula, which is an age based reduction," and a younger, less senior pilot received a greater number of shares.  Plaintiff testified in his deposition that he assumed that ALPA devised the distribution formula.  Doc. 86-4, deposition, p. 140 (p. 14 on ECF).  Plaintiff said that he thought United Air Lines was also responsible because it approved the distribution in the letter of agreement.  *Id.*, p. 15, deposition p. 141 (p. 15 on ECF).

13.  Likewise, ALPA sold a "convertible note" in the bankruptcy, but Plaintiff's share of that distribution was reduced based upon his age pursuant to the GAP2 formula such that Plaintiff received about 1/5 of the amount distributed to younger pilots

---

[8] This section summarizes undisputed facts provided by Plaintiff's affidavit.  The paragraph numbers correspond to the numbers in the affidavit.  This section does not include background information as to Plaintiff's piloting qualifications.  It is undisputed that Plaintiff was a qualified pilot for United Air Lines.  As noted earlier, the evidence concerning the distribution of shares and the convertible notes is not material to any claim set forth in the amended complaint, doc. 43.

junior to him on the seniority list.  Plaintiff testified in his deposition that the convertible notes were issued because ALPA agreed not to oppose the termination of the pilot pension plan.  Doc. 86-3, p. 12.

14.  A letter of agreement between United and ALPA "required simulator instructors fly line flights periodically."  This subjected simulator instructor positions to the Age 60 Rule.  Plaintiff contends this was "artificial," but presents no evidence that there was not a good business reason to require simulator instructors to periodically fly "line flights."

23.  "The United Airlines Pilot System Seniority of July 1, 2008, shows that during the period of December 17, 2007 to March 31, 2008, United Airlines placed 104 (103 younger than me) 'new hire' pilots in class."  As noted earlier, Plaintiff's application initially was incomplete because it stated on its face that Plaintiff was not qualified. Plaintiff's application was not deemed to be complete until late February or early March. Plaintiff has presented no evidence that anyone with an application dated after his application was put on the "new hire" pilots in class list.

**Legal Analysis**

### Age Discrimination in Employment Act claims

Pursuant to the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  "To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  Gross v. FBL Financial Services, Inc., __ U.S. __, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009).

### Discharge of Plaintiff upon attaining age 60

Plaintiff has not shown that his age was the reason that he was terminated by United Air Lines.  It is true that his 60th birthday triggered the termination, but the "but-for" cause of the termination was that Plaintiff was no longer eligible to fly due to the Age 60 Rule.  It was not United Air Line's rule.[9]  Thus, Plaintiff's age was not the "but-for" cause of the termination decision.

### Refusal to grant a leave of absence

To prove an ADEA claim, Plaintiff must in part prove that he was subjected to an "adverse employment action."  Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002).

"An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's

---

[9] Since it was not United Air Line's rule, the issue of whether the Age 60 Rule establishes a bona fide occupational qualification pursuant to 29 U.S.C. § 623(f)(1) seems beside the point, in my view.  Whether bona fide or not, it was not an occupational qualification established by United.

compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.' " *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir.2000) (*quoting Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir.1997)).

Van Voorhis v. Hillsborough County Bd. of County Com'rs, 512 F.3d 1296, 1300 (11th Cir. 2008).

Plaintiff requested an eighteen-month leave of absence beginning on May 11, 2007, the day before his sixtieth birthday. Defendant has established that it and ALPA had a policy that a leave of absence would terminate when a pilot reached age 60. This was so because, due to the Age 60 Rule, a pilot age 60 or over was no longer eligible to fly. A policy that a pilot cannot be on a leave of absence when the pilot is no longer eligible to fly due to the Age 60 Rule has not been shown by Plaintiff to be a violation of the ADEA, and Plaintiff could not make that showing for the reasons set forth above: the Age 60 Rule was not United's rule. The denial of the leave of absence for one day, therefore, caused no adverse employment consequences. Plaintiff was paid for work on May 11, 2007, and became disqualified to fly on May 12, 2007, when he reached age 60 due to the Age 60 Rule. The denial of a leave of absence has not been shown to have been an adverse employment action, and thus an ADEA violation has not been shown.

Additionally, the denial of a leave of absence has not been shown to have been a violation of the ADEA because Plaintiff has not shown that his age was the but-for cause of the denial. The leave of absence was denied due to the Age 60 Rule and the policy not to grant leaves of absence that extend into a period when the Age 60 Rule disqualified a pilot from flying.

**Refusal to join in Plaintiff's request to the FAA for a waiver**

The refusal of United Air Lines to join in Plaintiff's request to the FAA for a waiver of the Age 60 Rule was not an adverse employment action. It did not alter the material terms of Plaintiff's employment. The terms of Plaintiff's employment were, at all times, subject to the FAA rule, and that Rule was not imposed by United Air Lines. Thus, United's decision not to seek a waiver in Plaintiff's case was not the establishment of, or denial of, a material term of Plaintiff's employment by United.

**Failure to offer Plaintiff another job before or after enactment of the FTEPA**

It will be assumed that Plaintiff did not apply for the flight simulator instructor job before the enactment of the FTEPA because he was told that application would be futile. United Air Lines had a policy at that time that a flight simulator instructor had to actually fly an airplane from time to time. Plaintiff was then subject to the Age 60 Rule, and was not eligible for a flight simulator instructor job because he was not eligible to fly a plane. Plaintiff has not argued that United's requirement that a flight simulator instructor also fly from time to time was due to age discrimination.

It is undisputed that when Plaintiff applied for a piloting job after the FTEPA was enacted, he erroneously indicated that he lacked an essential qualification, that he was qualified to fly into all countries served by United. By the time that error was cleared up, in March, 2008, United had frozen all hiring due to economic conditions and changes in company structure after emerging from bankruptcy. It is accepted as true, as asserted by Plaintiff, that between December, 2007, and March, 2008, United Air Lines hired over one hundred new pilots, most of whom were younger. But there is no evidence that any

of those persons had application dates that were after the date of Plaintiff's completed application, and it is undisputed that by the time Plaintiff's erroneous disqualification was clarified, United Air Lines had frozen all new hires. United Air Lines has not employed any new pilots since March, 2008. As a consequence, Plaintiff has not shown that he was not offered another pilot job due to his age.

### Lobbying the FAA to retain the Age 60 Rule

Apparently Plaintiff claimed in his deposition that United violated the ADEA by lobbying the FAA and Congress to keep the Age 60 Rule. That claim is not in the amended complaint. Doc. 43. That claim also was not in the proposed second amended complaint, either, doc. 100, though the court denied leave to file that complaint. Docs. 104 and 107. The claim is not properly before this court.

Even if it were, United Air Lines has a First Amendment right to lobby Congress and the FAA. The Age 60 Rule was enacted in 1959. The ADEA was enacted much later. The ADEA did not impose an obligation upon an airline to lobby Congress or the FAA to dismantle the rule. More important, United's political position concerning the merits of the Age 60 Rule is not an adverse employment action as defined by the ADEA.

### Distribution of United Air Line corporate shares

Plaintiff contends in his response to the motion for summary judgment that the 2003 collective bargaining agreement contained concessions for work rules and rates of compensation, and in exchange for those concessions, United agreed to distribute between 1558 to 1482 shares for pilots with Plaintiff's seniority number. Doc. 89, pp. 19-20. Plaintiff contends that United Air Lines distributed only about half that number of

shares, (768) due to Plaintiff's age, but distributed the full amount to a younger pilot, Gillen. *Id.*, p. 20. He contends that this violated the ADEA.

Defendant did not address these allegations as an ADEA claim. Doc. 86, pp. 3-18 (addressing the ADEA claims). This ADEA claim was not alleged in the amended complaint. Doc. 43, pp. 1-6. It was not alleged as an ERISA claim either. *Id.*, pp. 6-7. The claim concerning the distribution of shares as a result of United's bankruptcy is not before this court. It will be addressed, however, in the alternative at the end of this report and recommendation.

### ERISA claim

Plaintiff alleges that United Air Lines "negotiated a total retirement package which discriminated against Plaintiff based solely on age, which favored younger employees, specifically Flight Officers (Pilots) with levels of seniority junior, equal or comparable to Plaintiff, to Plaintiff's detriment." Doc. 43, ¶ 29. He also alleges that Defendant "negotiated a retirement compensation package which eliminated fully paid medical insurance after retirement for Avera, a benefit which with 10 years of service Plaintiff was already vested, and, which discriminates against Plaintiff based solely on age." *Id.*, ¶ 30. Even though this section of the complaint mentions age discrimination, Plaintiff alleges that this violated the Employment Retirement Income Security Act. *Id.*

Defendant's response indicates that Plaintiff's claim is premised upon the collective bargaining agreement of 2003, pursuant to which retirement plan benefits were altered. Doc. 86, p. 17. Apparently this was clarified in Plaintiff's deposition. *Id.*, n. 13.

Defendant argues that ERISA does not apply because Plaintiff has not identified

an "employee benefit plan."  Doc. 86, p. 19.  Defendant argues that the collective

bargaining agreement that was in effect prior to 2003 was not an "employment benefit

plan."  *Id.*, pp. 19-20.

ERISA only applies to an "employment benefit plan."  Fort Halifax Packing Co.,

Inc. v. Coyne, 482 U.S. 1, 8, 107 S.Ct. 2211, 2215, 96 L.Ed.2d 1 (1987).

> By definition, then, a welfare plan requires (1) a "plan, fund, or program"
> (2) established or maintained (3) by an employer or by an employee
> organization, or by both, (4) for the purpose of providing medical, surgical,
> hospital care, sickness, accident, disability, death, unemployment or
> vacation benefits, apprenticeship or other training programs, day care
> centers, scholarship funds, prepaid legal services or severance benefits
> (5) to participants or their beneficiaries.

Donovan v. Dillingham, 688 F.2d 1367, 1371 (11th Cir. 1982).  "At a minimum, however,

a 'plan, fund, or program' under ERISA implies the existence of intended benefits,

intended beneficiaries, a source of financing, and a procedure to apply for and collect

benefits."  688 F.2d at 1372.  "In summary, a 'plan, fund, or program' under ERISA is

established if from the surrounding circumstances a reasonable person can ascertain

the intended benefits, a class of beneficiaries, the source of financing, and procedures

for receiving benefits."  *Id.*, at 1373.

Plaintiff has not come forward with evidence that the pre-2003 collective

bargaining agreement provided a source of financing or procedures for receiving

benefits.  It is probable that the pre-2003 collective bargaining agreement described

benefits that United Air Lines promised to establish, but the collective bargaining

agreement itself has not been shown to be an "employment benefit plan" governed by

ERISA.

Further, changes that were negotiated in benefit plans in the 2003 collective

bargaining agreement by United Air Lines are likewise not governed by ERISA.

> Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries.  As we said with respect to the amendment of welfare benefit plans in *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."  *Id.*, at 78, 115 S.Ct., at 1228 (*citing Adams v. Avondale Industries, Inc.*, 905 F.2d 943, 947 (C.A.6 1990)).  When employers undertake those actions, they do not act as fiduciaries, 514 U.S., at 78, 115 S.Ct., at 1228, but are analogous to the settlors of a trust, *see Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1188 (C.A.7 1994).

> . . .  As the Second Circuit has observed, "only when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration" does a person become a fiduciary under § 3(21)(A).  *Siskind v. Sperry Retirement Program, Unisys*, 47 F.3d 498, 505 (1995).  "[B]ecause [the] defined functions [in the definition of fiduciary] do not include plan design, an employer may decide to amend an employee benefit plan without being subject to fiduciary review."  *Ibid.*  We recently recognized this very point, noting that "it may be true that amending or terminating a plan . . . cannot be an act of plan 'management' or 'administration' "  *Varity Corp. v. Howe*, 516 U.S. 489, 505, 116 S.Ct. 1065, 1074, 134 L.Ed.2d 130 (1996).

Lockheed Corp. v. Spink, 517 U.S. 882, 890, 116 S.Ct. 1783, 1789, 135 L.Ed.2d 153

(1996).

> In general, an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets.  *See id.* [*Spink*], at 890, 116 S.Ct. 1783.  *ERISA's fiduciary duty requirement simply is not implicated where Hughes, acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated.  See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (describing how *ERISA does not mandate that "employers provide any particular benefits, and does not itself proscribe discrimination in the provision of employee benefits"*).

Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444, 119 S.Ct. 755, 763, 142 L.Ed.2d 881 (1999).  Thus, "[i]t is well established in this Court's cases that an employer's decision whether to terminate an ERISA plan is a settlor function immune from ERISA's fiduciary obligations."  Beck v. PACE Intern. Union, 551 U.S. 96, 101, 127 S.Ct. 2310, 2316, 168 L.Ed.2d 1 (2007).

The Court in Spinks noted, however, a claim may arise under 29 U.S.C. § 1054(g), because an amendment to a plan may not decrease "accrued" benefits.  517 U.S. at 891, 116 S.Ct. at 1790.  Section 1054(g) "considers the following to be accrued benefits:  the elimination or reduction of an early retirement benefit or subsidy; and the elimination of an optional form of benefit with respect to benefits attributable to service before the amendment."[10]  Aldridge v. Lily-Tulip, Inc. Salary Retirement Plan Benefits

---

[10] Subsection (g) provides:

Decrease of accrued benefits through amendment of plan

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title.

(2) For purposes of paragraph (1), a plan amendment which has the effect of –

(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or

(B) eliminating an optional form of benefit,

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.  In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy.  The Secretary of the Treasury shall by regulations provide that this paragraph shall not apply to any plan amendment which reduces or eliminates benefits or subsidies which create significant burdens or complexities for the plan and plan participants, unless such amendment adversely affects the rights of any participant in a more than de minimis manner.  The

Committee, 40 F.3d 1202, 1210-1211 (11th Cir. 1994).  Plaintiff has not come forward

with evidence that he had "accrued" benefits as so defined under any benefit plan that

existed prior to the 2003 collective bargaining agreement.[11]  Moreover, Plaintiff was not

retired at that time, and has not shown that at the time the changes were made, he

satisfied "the preamendment conditions for the subsidy."  29 U.S.C. § 1054(g).

Defendant is entitled to summary judgment as to this single ERISA claim contained in

the complaint.

While it has been noted above that ERISA claims based upon the distribution of

United Air Lines stock and the sale of the convertible notes by ALPA were not alleged in

the amended complaint, even if those claims were before the court, ERISA is not

implicated.  The Supreme Court held that a one-time severance payment provided by a

state is not preempted by ERISA.  Fort Halifax, 482 U.S. at 19, 107 S.Ct. at 2221.  This

is so because a one time payment lacks the procedures for collecting benefits that

characterize an "employee benefit plan" governed by ERISA.

> In *Fort Halifax*, after the employer closed its poultry packaging and
> processing plant, the state of Maine sued to enforce a state statute
> requiring the employer to provide a one-time severance payment to
> certain employees.  The employer argued, *inter alia*, that the state statute

---

Secretary of the Treasury may by regulations provide that this subparagraph shall not
apply to a plan amendment described in subparagraph (B) (other than a plan
amendment having an effect described in subparagraph (A)).

[11] "No one denies that some conditions enforceable by suspending benefit
payments are permissible under ERISA:  conditions set before a benefit accrues can
survive the anti-cutback rule [section 1054(g)], even though their sanction is a
suspension of benefits.  Because such conditions are elements of the benefit itself and
are considered in valuing it at the moment it accrues, a later suspension of benefit
payments according to the Plan's terms does not eliminate the benefit or reduce its
value."  Central Laborers' Pension Fund v. Heinz, 541 U.S. 739, 745-746, 124 S.Ct.
2230, 2236, 159 L.Ed.2d 46 (2004).

was preempted by ERISA and therefore unenforceable. The Supreme
Court held that ERISA was inapplicable because a one-time payment did
not require the sort of ongoing administrative scheme characteristic of an
ERISA plan. The Court reasoned that a purpose of ERISA preemption, "to
afford employers the advantages of a uniform set of administrative
procedures governed by a single set of regulations," *Fort Halifax* at 11,
107 S.Ct. at 2217, was not compromised where "[t]he employer assumes
no responsibility to pay benefits on a regular basis." *Id.* at 12, 107 S.Ct. at
2218. The Court concluded that "[t]he theoretical possibility of a one-time
obligation in the future simply creates no need for an ongoing
administrative program for processing claims and paying benefits." *Id.*

Williams v. Wright, 927 F.2d 1540, 1544 (11th Cir. 1991).

Further, though not alleged in the complaint as an ADEA claim, the distribution of

stock and the distribution of the proceeds from the sale of convertible notes has not

been shown by Plaintiff to have been accomplished by a formula based upon age.

Defendant asserts that the distribution formula in both cases was based upon seniority,

not age, and Plaintiff has come forward with no evidence to create a genuine dispute of

material fact as to that question. Plaintiff did not begin to work for United Air Lines until

May 8, 1994, and he did not have seniority with United Airlines commensurate with his

age, and this would explain why younger pilots with more seniority might have been

treated differently.

**Conclusion**

I have noted before that this is a hard case on the facts. The FTEPA allowed

Plaintiff to continue to hold a license to fly until age 65. But since he was no longer

employed with United, he no longer had his seniority when he reapplied for a job. Had

the FTEPA been enacted seven months earlier, Plaintiff might still be a pilot for United,

at least until May, 2012, when he becomes 65. Nevertheless, Defendant United Air

Lines is entitled to summary judgment.

**Recommendation**

Accordingly, it is **RECOMMENDED** that Defendant United Air Line's motion for summary judgment, doc. 86, be **GRANTED** and judgment be entered in favor of United Air Lines.  It is further **RECOMMENDED** that the court confirm that claims against the United States have been **DISMISSED**, and the Clerk be directed to close this file.

**IN CHAMBERS** at Tallahassee, Florida, on February 8, 2011.


 s/     William C. Sherrill, Jr._____
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**